**DEFENDERS OF WILDLIFE, Plaintiff,**

v.

**Cecil D. ANDRUS et al., Defendants.**

**Civ. A. No. 78–1332.**

United States District Court,
District of Columbia,
Civil Division.

Aug. 18, 1978.

Roberts B. Owen, Jeffrey H. Howard, Washington, D. C., for plaintiff.

Irwin L. Schroeder, William Hill, Dept. of Justice, Washington, D. C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

*Findings of Fact*

1. Public use of the Refuge currently exceeds 50,000 visitors each year. Approximately 30,000 boaters annually are now using the 7,000-acre South Sump that makes up the southern portion of the Refuge. P. Ex. 9 at I–1. In recent years the annual increase in boating has exceeded 19% and is projected to increase in the Elko County portion of the Refuge by over 300% by the year 2020. P. Ex. 9 at I–17, Figure 3.

2. The preferred nesting habitat for migratory birds is located in the South Sump. Although some nesting takes place outside this area, approximately 85% of canvasback and redhead production would occur in the South Sump. P. Ex. 9 at III–5, Figure 7.

3. The reproductive cycle of over-water nesting ducks at the Refuge consists of four distinct stages: nest site selection, initial nesting, late nesting and re-nesting, and broodrearing. Waterfowl production on the Refuge for any given year is determined by the breeding population density, nesting success, and duckling survival. P. Ex. 9 at III–1.

4. Hens flush easily when disturbed by either canoe or powerboat even after nesting is well underway (P. Ex. 31 at 6), but this disturbance decreases as incubation proceeds.

5. Powerboating may cause abandonment of established nests. P. Ex. 9 at III–12, III–14 to III–16.

6. Re-nesting may occur when the first nest is lost through predation, destruction or abandonment. Re-nesting is an ordinary occurrence for canvasback and redhead ducks and re-nesting success is essential to the maintenance of production levels of the Refuge. Approximately once every four years canvasback and redhead ducks nest later than usual due to climatic conditions. Late nesting and re-nesting ducks go through both nest site selection and actual nesting stages, which together extend from May 15 through September 1. P. Ex. 9 at III–14 to III–19, VIII–49. Even in normal years delayed nesting is typical of redheads throughout their range. P. Ex. 9 at III–15. Re-nesting may account for up to 46% of the total nesting of redhead ducks in a given season. P. Ex. 9 at III–14.

7. Broodrearing is the period from the hatching of the egg until the hen abandons the brood. During broodrearing, ducklings are dependent upon the hen for safety, and their vulnerability to predators is increased in her absence. Disturbances caused by internal combustion powerboats may separate hens from ducklings. Broodrearing continues from about April 25 to September 30 in each season. P. Ex. 9 at III–20 to III–24.

8. Mechanical cutting action of propellers on aquatic vegetation and increased turbidity caused by motors decreases vegetative productivity of the Refuge. Emer-

gent vegetation such as hard-stem bulrush, used by migratory waterfowl for nesting, may be removed by motorboats creating new channels. P. Ex. 9 at III–29 to III–38; P. Ex. 28; P. Ex. 29.

9. Samples taken on the Refuge demonstrate that where no boating was permitted the marsh produced 328% more submergent vegetation than in areas of heavy boating. P. Ex. 9 at III–30, Table 8.

10. Nesting ducks on the Refuge may be flushed from their nests by the noise of a 25 horsepower boat passing at full throttle within 300 yards of the nest. P. Ex. 9 at III–6.

11. Total Refuge waterfowl use days show a steady downward trend over the past twenty years and it appears that the most obvious cause for the decline in waterfowl use is human disturbance. P. Ex. 9 at III–28.

12. Unlimited horsepower powerboating without appropriate regulation has had unavoidable adverse impacts on over-water nesting waterfowl and has resulted in lower waterfowl production and less wildlife diversity. P. Ex. 9 at V–1; P. Ex. 1 ¶ 15; P. Ex. 2 ¶ 8.

13. The annual loss of waterfowl production in any particular year due to boating activities is an irretrievable loss to the continental waterfowl population. P. Ex. 9 at VII–1.

14. When boats of unlimited horsepower are permitted without appropriate regulation, the long-term effects of boating are cumulative and will ultimately determine the number of birds returning to nest at the Refuge in future years. P. Ex. 9 at VI–1, VII–1.

15. The impacts of boating under the circumstances described in paragraph 14 above, extend to other wildlife species found on the Refuge and may be essentially similar to those on canvasbacks and redheads for other over-water nesting waterfowl including the ruddy duck. P. Ex. 10 at 2.

16. Waterskiing in a waterfowl nesting area within a migratory bird sanctuary does not promote or enhance, and may harm, waterfowl habitat, nest site selection, nesting, re-nesting, late nesting, or broodrearing.

17. The use of unlimited horsepower internal combustion motors in a waterfowl nesting area within a migratory bird sanctuary does not promote or enhance, and may harm, waterfowl habitat, nest site selection, nesting, re-nesting, late nesting or broodrearing.

18. On July 19, 1978, the Director, Fish and Wildlife Service, signed special regulations which permit powerboating, motorless boating, and waterskiing within the Ruby Lake National Wildlife Refuge (the "Refuge"). These July 19, 1978 regulations are in large part the same as the April 21, 1978 special regulations which this Court held to be unlawful in *Defenders of Wildlife et al. v. Andrus et al.*, Civil Action No. 78–1210.

19. If the regulations are permitted to continue in effect they will immediately and irreparably damage plaintiff's interests and the wildlife resources of the Refuge. The use of powerboats of unlimited horsepower on the Refuge (including for waterskiing) will directly and immediately harm the wildlife resources of the Refuge (i) by reducing submergent aquatic vegetation which is the principal food source for migratory waterfowl (P. Ex. 9 at III–29 to III–38, V–1); (ii) by reducing macroinvertebrate populations which are the principal food sources for ducklings (*Id.*); (iii) by breaking up broods, by separating ducklings from their hen, by forcing broods out of brooding areas, and thereby reducing brood size (P. Ex. 9 at III–20); and (iv) by reducing the reproductive success of late nesting and re-nesting hens. P. Ex. 9 at III–8, III–13 to III–20, III–28, III–38, VIII–48, VIII–49.

20. Late nesting and re-nesting extends through September 1 of each season and occurs with sufficient frequency to be significant to the immediate and long-term productivity of the Refuge. P. Ex. 9 at III–14 to III–18.

21(a). The level of boating use permitted by these regulations is not incidental to or compatible with, and will interfere with the primary purpose of the Refuge.

(b). The suggestion that horsepower limitations would not be appropriate, and would not aid the primary purpose of the Refuge, is completely contrary to all reason and the facts of the record.

(c). The proposed speed limitations to be used in conjunction with horsepower are so obviously unenforceable that to rely on a speed limitation, even as high as twenty miles an hour, is unrealistic because of its very unenforceability.

### Conclusions of Law

22. The regulations violate the statutory standard of the Refuge Recreation Act because the degree and manner of boating use which they would permit is not incidental or secondary use, is inconsistent, and would interfere with the Refuge's primary purpose.

23. The regulations violate the statutory standard of the Refuge Recreation Act because the degree and manner of boating use which they would permit is not practicable because of their unenforceability.

24. The Secretary's determination that the level of boating permitted by the regulations does not interfere with the Refuge's primary purpose is arbitrary and capricious.

25. Based on the record in this action, the use of boats with unlimited horsepower in the South Sump of the Refuge is inconsistent and interferes with its primary purpose as a refuge and breeding ground for migratory birds and wildlife.

An Order consistent with the foregoing Findings of Fact and Conclusions of Law has been entered this day.